IN THE
UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| DANYALE CARTER,<br><br>    Plaintiff,<br><br>v.<br><br>NATHAN SIMS,<br><br>    Defendant. | Case No. 3:23-cv-03064-JEH |

**Order**

Plaintiff, proceeding pro se and presently incarcerated at Logan Correctional Center brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging Eighth Amendment claims for excessive force and for conducting a shakedown in a manner allegedly designed to harass or humiliate. The matter comes before this Court for entry of a default judgment and the Court's determination of damages.

**I**

Plaintiff[1] filed this lawsuit on March 21, 2023, alleging an incident that occurred on February 6, 2022. (Doc. 1). The Court's Merit Review Order entered May 17, 2023, summarized his allegations as follows:

---

[1] Plaintiff is incarcerated at Logan Correctional Center, which houses female inmates. Plaintiff states in a motion that he is a "transgender male (female to male)." (Doc. 4 at 3). Based on Plaintiff's statements, the Court will refer to Plaintiff with the pronouns he/him.

> Plaintiff alleges that Defendant Sims made derogatory and racist statements, threatened him, would not leave while he got dressed, and conducted a shakedown of his cell. Plaintiff alleges that Defendant Sims "destroyed" his cell, broke several of his belongings, and confiscated laundry detergent that prison officials had authorized. Plaintiff alleges that Defendant York ignored his requests to call a supervisor and to file a complaint. He alleges that Defendants Bailey, Beck, and Dawson arrived later and stayed with him in the dayroom during the search and advised him just to let Defendant Sims search the cell and file a grievance afterwards.
>
> Plaintiff alleges that, after the shakedown, Defendant Sims grabbed his dreadlocks, slammed him on a desk, choked him, and threw him against a wall when he attempted to walk away and continued after he had raised her hands in the air to show no resistance. Plaintiff alleges that Defendant Sims stopped when Defendant Beck came back to the unit.
>
> Plaintiff alleges that Defendants Case and Russell did not speak with him or investigate his grievances or Prison Rape Elimination Act (PREA) complaints. Plaintiff alleges ongoing medical issues arising from these incidents.

(Doc. 8 at 1-2). Pursuant to 28 U.S.C. § 1915A, the Court found that Plaintiff stated Eighth Amendment claims for excessive force and for conducting a shakedown in a manner allegedly designed to harass or humiliate. *Id.* at 2.

Defendant Sims appeared in this case, requested and received additional time to find counsel and file an answer, and thereafter failed to file an answer or otherwise plead within the applicable deadline. *See* (Doc. 25) (summarizing the Court's efforts to obtain service and facilitate Defendant Sims' response). In its Order entered February 18, 2025, the Court granted Plaintiff's request for entry of a default against Defendant Sims and granted Defendant Sims leave to file a

2

response to show good cause why the Court should not proceed to a hearing on damages. *Id.* at 4. Defendant Sims failed to respond.[2]

## II

Upon entry of default pursuant to Fed. R. Civ. P. 55(a), "the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not." *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. 54(c). Notwithstanding the entry of default, "the plaintiff still must establish his entitlement to the relief he seeks." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004); *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014) ("[W]hile a default judgment conclusively establishes liability, the victor must still prove up damages.").

A district court should conduct a hearing on damages "unless … the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983); Fed. R. Civ. P. 55(b)(1)-(2). The Court conducted a hearing on September 26, 2025.

Plaintiff's testimony at the hearing was consistent with the allegations in his complaint and the Court's summation in its Merit Review Order. Regarding the cell search, Plaintiff testified that Defendant Sims had opened his door without warning during his Muslim prayers and demanded that Plaintiff leave the cell at a time he was not appropriately dressed. Tr. 4:8-11. Plaintiff testified that he complied with Defendant's order to leave the cell after he put on appropriate

---

[2] Correspondence the Court sent to Defendant Sims was recently returned as undeliverable. *See* (Docs. 35-40). Nothing in the record suggests that Defendant Sims did not receive the notice of the default entered February 18, 2025, that the Court sent to him.

clothing. Tr. 4:12-15. When Plaintiff asked Defendant why he was covering the chuckhole to obstruct Plaintiff's view of the search, Defendant Sims told Plaintiff "to get the fuck away from the door again or he was gonna use force." Tr. 5:16-17.

Plaintiff testified that a conversation ensued regarding why Defendant Sims was confiscating non-prohibited items. When Plaintiff attempted to walk away:

> [Defendant Sims] grabbed me by my dreads and slammed me on top of the CO's desk in the day room. Once he did that, he snatched me off, wrapped his forearm around my throat and proceeded to tighten it.
>
> … I just put my hands up because I didn't want him to…get even more excessive with…his grip so I'm asking him, I'm trying to tell him that he choking me but my words wouldn't come out no more. So after that he continued to tighten his forearm around my throat.
>
> He forcefully put his body weight on my back and rushed me, like, bull rushed me into the wall. And when he did, he took his left hand and slammed my head against the wall and twisted my arm behind my back like upward and he was leaning on me. So during that time, all the other inmates was just, like, pretty much in a panic, in an uproar asking why he was doing that.
>
> I heard them, but he was trying to take me down, so I was trying to keep him from putting me on the ground because I figured if he got me on the ground, I was so scared that he was gonna slam my head against the floor because I just had a brain injury, so I couldn't really risk that, so I wouldn't let him take me down, which is why he bull rushed me.

Tr. 6:22-7:22. Plaintiff testified that Defendant Sims stopped when other officers arrived. Tr. 7:23-8:1.

The medical records Plaintiff provided at the hearing (Exhibit 1) indicate that he had suffered a stroke at least three-to-four months prior to the events at issue, that he had suffered seizures since at least 2018, and that he suffered intercranial bleeding "resulting in left LE weakness on September 11th." Ex. 1 at

4

1-2, 17, 19. An MRI conducted in October 2021 confirmed the intercranial bleeding. *Id.* at 3.

Following the incident, Plaintiff reported to medical staff on February 7, 2022, a headache, neck pain, eye pain, dizziness, and vision problems that medical staff appears to have treated with Tylenol, eye drops, and admission to the infirmary for observation. *Id.* at 7-13. Plaintiff described the headache pain as a 9 or 10 on a scale of 1-10 with 10 being the greatest amount of pain. *Id.* at 7-8, 11.

An unsigned, handwritten note in the medical records dated February 10, 2022, states:

> extensive trauma to brain after forceful impact to head 2/6/22 [unintelligible] right side [unintelligible] contusion that result from excessive force impact. Seizures will increase more frequent medications increase Keppra 1500 mg indefinitely constant migraines consistent permanent brain damage…indefinite for observation of hemorrhage and clot managements.

*Id.* at 14. An MRI conducted the same date disclosed:

> [f]urther evolution of right paramedian parietal hemorrhage, now demonstrating developing encephalomalacia and marginal gliosis. Persistent curvilinear and somewhat nodular enhancement within and surrounding the hematoma, decreased from 10/21/21 possibly related to evolution of hemorrhage.

*Id.* at 19. A note at the bottom of the record states: "Encephalomalacia is common in patients with intracranial bleeding. It may not be reversible." *Id.* (cleaned up).

Plaintiff testified that he "still [does not] feel comfortable with being…aggressively dealt with by COs," and that he had been diagnosed with post-traumatic stress disorder (PTSD) and anxiety for which he now takes medications. Tr. 9:6-9. The medical records reflect these diagnoses. Ex. 1 at 16. Plaintiff did not provide records dated after February 16, 2022.

III

A

Plaintiff's complaint demanded "punitive damages, conspiratorial damages, pain and suffering, mental anguish, emotional and mental distress" without specifying an exact dollar amount. (Doc. 1 at 13). He testified at the hearing that he is seeking $4,000,000.00 in damages "because this is a lifelong injury." He argued that Defendant's actions made his pre-existing conditions "extensively worse," resulting in more seizures, increased dosages of medication, and a reduced chance of a full recovery. Plaintiff stated that he will have medical bills for the foreseeable future, including those for surgery after he is released from prison.

B

Plaintiff is entitled to compensatory damages for any injury resulting from Defendant Sims' unconstitutional use of force and cell shakedown, including for the pain he reported to medical staff after the incident. He is also not precluded from recovering damages for any related emotional distress he endured. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.").

A district court has "broad latitude" in quantifying damages. *Domanus*, 742 F.3d at 303. The law requires the trier of fact to "select a dollar amount that it believes will fairly compensate the plaintiff." *Hendrickson v. Cooper*, 589 F.3d 887, 892-93 (7th Cir. 2009); *see also* Seventh Circuit Pattern Civil Jury Instruction 7.27 ("There is no exact standard for setting the damages to be awarded on account of pain and suffering.").

Prison officials have a constitutional duty to provide medical care, and Plaintiff appears to have been in continuous custody since these events transpired. For that reason, the Court can assume that Plaintiff has not and will not incur out-of-pocket medical expenses so long as he remains incarcerated.[3] The record lacks evidence regarding Plaintiff's future medical costs once released, the present value of same, and an estimation of those attributable to Defendant's conduct, not just Plaintiff's underlying condition. The unsigned medical note dated February 10, 2025, does not conclusively establish the necessity or extent of future treatment. Plaintiff does not appear to have suffered any physical injury or other damages resulting from the cell shakedown.

Plaintiff established that he suffered severe headache pain following the incident and the medical records permit the inference that his symptoms (migraine headaches, seizures) will become more frequent than they would have had this incident not occurred. The nature of the PTSD and anxiety Plaintiff now suffers, combined with his ongoing incarceration and the daily interactions it requires, makes it likely that Plaintiff will continue to experience mental and emotional distress for the remainder of his incarceration, not to mention the emotional distress resulting from the uncertainty now surrounding his underlying conditions. The question before the Court is how to quantify these damages.

Though not dispositive, comparisons to previous compensatory damages awards may provide some direction. *See Hendrickson*, 589 F.3d at 892 (comparisons to compensatory damages awarded in similar cases "are rarely dispositive given

---

[3] Online records from the Illinois Department of Corrections indicate that Plaintiff's projected parole date is June 11, 2027. IDOC Individual in Custody Search, available at: https://idoc.illinois.gov/offender/inmatesearch.html (enter the identifying information in the appropriate box) (last accessed Oct. 30, 2025).

7

the fact-specific nature of damages claims."). The Court found two relatively recent jury verdicts for excessive force claims arising in this district.

In *Scott v. Francis*, No. 1:19-cv-01143-EIL (C.D. Ill.), the plaintiff alleged that defendants sprayed him with chemical spray at least six times, punched him repeatedly after he was restrained, forced him to kneel against a wall for 45 minutes, and subjected him to a humiliating strip search. *Id.*, ECF No. 20 at 2-3. After finding for Plaintiff on the excessive force claim against one defendant, the jury awarded $20,000.00 in compensatory damages and $10,000.00 in punitive damages. *Id.*, ECF No. 118.

In *Walker v. Davis*, No. 1:19-cv-01086-CSB (C.D. Ill.), the plaintiff alleged that defendant kicked him in his back, caused his chin to hit the floor, kicked him while he was on the ground and handcuffed, and threatened to use chemical spray in part because he was mad that Plaintiff had filed a grievance. *Id.*, ECF No. 6. The jury found in Plaintiff's favor on the excessive force claim and awarded $1,400.00 in compensatory damages and $0.00 in punitive damages. *Id.*, ECF No. 70.

The nature of the force and the injuries sustained in these cases do not appear to involve the same type of lasting harm at issue here. On that point, *Hendrickson*, a case from the Southern District of Indiana, provides some guidance. The jury in that case awarded $75,000.00 in compensatory damages and $125,000.00 in punitive damages for an alleged unprovoked and gratuitous use of force that aggravated the plaintiff's pre-existing brain and neck injuries, resulting in severe and persistent physical pain.

*Hendrickson* does not appear to have involved damages for emotional distress or at least does not indicate that the plaintiff had been diagnosed with mental health conditions related to the constitutional violations. The damages Plaintiff suffered here, comparatively speaking, are greater than those suffered in

8

the cases above and presumably entitle Plaintiff to a greater compensatory damages award. Considering the pain that Plaintiff experienced immediately after the attack and the pain and emotional distress he has endured in the almost four years since the incident and will endure going forward, the Court awards compensatory damages in the amount of 80,000.00.

## C

"Punitive damages are only appropriate…when a defendant's conduct was driven 'by evil motive or intent' or when 'it involve[d] reckless or callous indifference to the federally protected rights of others.'" *Stewardson v. Titus*, 126 F.4th 1264, 1272 (7th Cir. 2025) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Factors include: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.*

Plaintiff's conversation with Defendant Sims during the cell search appears to have been less than amicable, but no reasonable inference exists that force was required when Plaintiff attempted to walk away carrying a container of laundry detergent. Defendant Sims' unprovoked use of force lasted much longer than necessary to subdue any threat Plaintiff posed, and his use of a chokehold and bull rushing Plaintiff into a wall cannot be reasonably interpreted as attempt to apply restraints. The Court finds that punitive damages are appropriate.

The injuries Plaintiff incurred are similar to those at issue in *Hendrickson*, but the nature of Defendant Sims' attack was not nearly as egregious. 589 F.3d at 894-95 ("Cooper's actions were deliberate and calculated to create a violent confrontation with Hendrickson. Cooper goaded Hendrickson into leveling an

9

insult, which Cooper used as an excuse to attack. Cooper then lay in wait for Hendrickson to enter the housing unit. When Hendrickson finally appeared, Cooper grabbed, shoved, floored, and kneed him."). The Seventh Circuit also acknowledged that the $125,000.00 punitive damages award in that case "approaches the upper end of what was necessary to punish [the defendant's] lone act of attacking a prisoner for no good reason." *Hendrickson*, 589 F.3d at 894.

      The nature of the attack Plaintiff endured, while seemingly unprovoked, is closer to the facts in *Scott* where the use of force continued after any reason for it had dissipated. Nothing in the record suggests that Defendant Sims knew about Plaintiff's pre-existing medical conditions, such that the Court could infer a greater level of malice. The use of force in this case appears to have been an isolated incident stemming from some previous, nonviolent animosity between the parties. Based on these factors, the Court awards punitive damages in the amount of $10,000.00.

      **The Court awards compensatory damages of $80,000.00 and punitive damages in the amount of $10,000.00. The Clerk is directed to enter default judgment in favor of Plaintiff accordingly.**

*It is so ordered.*

Entered: October 31, 2025

s/Jonathan E. Hawley
U.S. District Judge